James S. ROBINSON, et al., Plaintiffs,

v.

HOUSTON–GALVESTON AREA COUNCIL, et al., Defendants.

Civ. No. H–81–2458.

United States District Court,
S.D. Texas,
Houston Division.

April 4, 1983.

Robert J. Swift, Fulbright & Jaworski, Robert G. Darden, Asst. U.S. Atty., Houston, Tex., Suzanne Cochran, Dallas, Tex., for defendants; Frank V. Smith, III, Dallas, Tex., of counsel.

Stefan Presser, American Civil Liberties Union, Houston, Tex., James Wyckoff, Wyckoff, Russell Dunn & Frazier, Houston, Tex., for plaintiffs.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SINGLETON, Chief Judge.

## FINDINGS OF FACT

The Houston-Galveston Area Council ("H–GAC") is a Regional Planning Commission composed of elected officials in thirteen counties in this region of Texas. The H–GAC was created and organized under the laws of the State of Texas, Tex.Rev.Civ. Stat.Ann. art. 1011m (Vernon's Supp. 1963–1982), for the purpose of improving the health, safety, and general welfare of the citizens within these counties. As such, it is a political subdivision of the state. *Id.* § 4.

In 1976, the H–GAC sought designation from the Secretary of the Department of Health, Education, and Welfare (presently the Department of Health and Human Services) as this region's Health Systems Agency ("HSA") pursuant to the National Health Planning and Development Act, 42 U.S.C. § 300 et seq. This Act authorizes the Secretary to enter into contracts with local organizations, and thereby provide federal funding, in order to improve the health of the residents and the quality of health care services within a region. *See id.* §§ 300*l*–2(a), 300*l*–4, 300*l*–5. Under the Act, a public regional planning body, such as the H–GAC may be designated as an HSA if it establishes a separate governing body for health planning that has exclusive authority for carrying out the dictates of the Act. *Id.* § 300*l*–1(b)(1)(B), 300*l*

–1(b)(3)(A), (B). The Secretary is authorized to establish standards regulating the structure and functioning of HSA's, which requirements must be met by the designee.

As prescribed by the Act, the H–GAC created a governing body, called the Area Health Commission, (the "Commission") for health care planning. The H–GAC was conditionally designated this region's HSA in 1976, and conditional designation was extended for another year in 1977. To achieve conditional designation, applicants such as the H–GAC must assure the Secretary that upon completion of the period of conditional designation the applicant will meet the requirements of the Act and be qualified to perform all of the required functions, and during the period of conditional designation, the Secretary is to make a determination that the designee in fact has met the requirements and is able to perform the functions set out in the Act. *Id.* § 300*l*–4; 42 C.F.R. § 122.104(a)(12).

Upon receiving conditional designation in 1976, the H–GAC appointed plaintiffs to be Commissioners of the Area Health Commission. A total of seventy-two commissioners were appointed. Commissioners were charged under the Act with responsibility for the internal affairs of the Commission, including matters of staff and budget and procedures applicable to the Commission's functions. P.L. 93–641, § 1512(3)(B), *reprinted in* (1974) *U.S.Code Cong. & Ad. News* 2594. During 1976 and 1977, however, the H–GAC controlled the internal affairs of the Commission including matters of personnel and budget.

Testimony at trial revealed constant disputes between the H–GAC and the Commission concerning the amount of control exercised by the H–GAC over the Commission's affairs. The plaintiffs contend that the H–GAC's control hampered the Commissioner's ability to carry out the mandates of the Act. Specifically, the plaintiffs charged that H–GAC's accounting procedures were deficient and that they therefore could not adequately assess how much of the health care grant had been spent at any given time and thus could not plan

future programs. The plaintiffs further charged that their planning abilities were disrupted by the H–GAC's refusal or delayed payment of the Commission's bills, and that the degree of interference contributed to the high staff turnover of the Commission, which caused additional disruption of their work.

In January and February 1977, correspondence from the Chief Health Planning and Facilities Branch Division of Resources Development and the Regional Health Administrator to the Chairman of the H–GAC clarified the relationship between the H–GAC and the Commission. This correspondence made it clear to the H–GAC that the Commission was responsible for administrative functions, such as hiring the Director of Health Planning, developing policies for hiring consultants, and executing contracts to perform required activities, as well as budgeting functions.

Conflicts between the H–GAC and the Commission, however, persisted. A Special Assessment Report of the H–GAC, prepared by the Regional Office of the Department of Health, Education, and Welfare following an on-site visit of October 1977, documented the on-going conflict between the two groups. In addition to the difference in opinion regarding the issuance of contracts and the hiring of a director for the Commission, the report noted the deficiencies in the H–GAC's financial management, dissatisfaction by members of the Commission over the amount of indirect cost charged to the HSA grant in comparison to the services or support received for such costs,[1] and a physical intermingling of the Commission's staff with the staff of the H–GAC which was disruptive and not conducive to organized management and productivity.

In its report, the regional office recommended that the indirect cost issue be resolved prior to submission of an application for redesignation staff space for Commission staff be established along with appro-

priate equipment provided for them to perform staff functions, and a system for documenting commission costs be implemented. Finally, the report notes that "continued HEW grant support of the H–GAC health planning component is dependent upon a viable partnership of mutual trust between the H–GAC Board of Directors and the [Commission]" and that, "[t]o successfully relate to the community, the agency will have to develop an identity of its own, separate and apart from H–GAC."

In August 1978, the conditional designation of the H–GAC as this area's HSA was extended for ninety days. During this period, the Department of Health, Education, and Welfare, in an October 1978 briefing from the Director of the Office of Regional Health Planning to the Regional Health Administrator, considered the option of the Commission seeking HSA designation as a nonprofit entity due to the differing views of the H–GAC and the Commission.

In an effort to avoid losing HSA designation, the H–GAC adopted a set of by-laws for the Commission which recognized plaintiff's authority to manage the HSA's budget and personnel. The H–GAC subsequently submitted these by-laws to the Department of Health, Education, and Welfare in their application for full designation, as required by the Department's regulations. 42 C.F.R. § 122.104(b)(1). Thereafter, the H–GAC was granted full HSA status.

The plaintiffs testified at trial that, after having been given authority to control their internal affairs without interference from the H–GAC, they and the other Commissioners were able to carry out the mandates of the Act. Specifically, they testified that over the next two years, the Commission was able to institute a number of programs in the areas of infant mortality, chemical abuse, and emergency health care, as well as programs for the treatment of cancer and the terminally ill.

In September 1979, Congress amended the National Health Planning and Re-

---

1. The indirect rate is the rate charged to the HSA grant covering the costs incurred by the H–GAC's participation in the federal program, which is negotiated by the Department of Labor.

sources Development Act, 42 U.S.C. § 300 et seq., allowing for umbrella groups, such as the H–GAC, to assume budget and personnel rule making authority. P.L. 96–79, § 110, 93 Stat. 603–05, (Oct. 4, 1979). It was not until April 1981 that the H–GAC adopted a resolution to resume control over the HSA's budget and personnel. The H–GAC alleged that they did so as an economy measure in anticipation of reduced federal funding. This resolution amended the Commission's by-laws. The H–GAC did not seek prior approval of their actions with the Department of Health and Human Services, although the acting Director of the Bureau of Health Planning stated that preclearance with the department was required for changes to the by-laws. On April 27, 1981, plaintiffs passed a resolution in which they declared the H–GAC's resolution a nullity and directed that the Commission would continue to operate as if the H–GAC had not passed the resolution.

Upon hearing that the H–GAC planned to make additional changes in the internal operations of the Commission by altering the method for selecting Commissioners, the plaintiffs wrote the regional and national offices of the Department of Health and Human Services requesting clarification regarding procedures for revising the selection process. The regional office replied that the H–GAC could not take actions contrary to the by-laws, as this could lead to termination of the designation and grant. Thus, any change in the selection process would require an amendment to the by-laws, and the revision process contained in the by-laws would have to be followed. The revision process as contained in the by-laws requires that amendments to the by-laws originate with the Commission.

From the national office, plaintiffs were apprised that Dr. Colin Rorrie, Director of the Bureau of Health Planning, questioned whether the H–GAC's resumption of control over the Commission's internal operations was in fact cost efficient. On April 29, 1981, Dr. Rorrie requested an on-site inspection of the H–GAC to determine the reasonableness of the indirect rate charged by the H–GAC to the HSA grant. The inspection revealed that the Commission was bearing an inappropriate share of the indirect costs distributed by the H–GAC.

In May 1981, plaintiffs, along with a majority of the Commission, adopted a resolution calling for the creation of a not-for-profit corporation which would seek HSA designation in place of the H–GAC. Plaintiffs took this action because they believed that the re-assumption of their internal affairs by the H–GAC would make it impossible to do health care planning. They also objected to H–GAC's method of amending the Commission's by-laws and to the amount of the indirect rate charged to the Commission.

On June 2, 1981, Dr. Rorrie sent a telegram to Judge R.A. Deison, then Chairman of the H–GAC, in which he informed Judge Deison that he did not intend to renew the H–GAC's HSA status, unless the H–GAC was able to resolve its problems with the Commission. Dr. Rorrie stated:

> When the management of the Health Systems Agency was under the control of the Houston-Galveston Area Council in the past, there were serious operational problems, for example, the Commission experienced difficulty obtaining services from the Houston-Galveston Area Council, there was a high turnover in Commission directors, there were long delays in accomplishing HSA functions, including problems in developing acceptable health systems plans, during its period of conditional designation, the Agency was unable to qualify for full designation within twenty-four months and required a waiver to allow it an additional twelve months to meet the requirements of full designation.

To resolve its conflicts with the Commission, Dr. Rorrie set forth the following guidelines, which he expected the H–GAC to implement before August 1, 1981:

> 1—A reduction in the indirect costs charged to the grant, to an amount not exceeding 10–12 percent of the direct costs, to be determined through analysis and negotiations.

2—A detailed description of what administrative control of the Area Health Commission that the Houston-Galveston Area Council is proposing to assume, and how that will operate.

3—Establishment of rules by which the Boards of each entity will deal with each other and which contain provisions for the Houston-Galveston Area Council to involve the Area Health Commission at an early stage in all proposed actions which concern the Area Health Commission, its functions, its administration, its staff, and its budget.

4—The governing body selection process should be rewritten so that it is more clearly understood and is acceptable to both parties. This process must be submitted to me for formal approval in advance.

In July 1981, representatives from the H–GAC and the Commission met to work out a solution to their disagreements. The Commission offered a written proposal, that would allow for the not-for-profit corporation to be the designee of the grant. Judge Deison indicated that this proposal would not be acceptable to a majority of the H–GAC. The H–GAC subsequently submitted their proposal, which was objected to by the Commission as inconsistent with Dr. Rorrie's June telegram. The groups failed to reach agreement by the August 2 deadline.

On August 6, 1981, the Department of Health and Human Services held a hearing on whether the H–GAC should be dedesignated as this area's HSA, pursuant to the requirements of the National Health Planning and Development Act, 42 U.S.C. § 300*l*–4(c)(3)(B)(ii). Plaintiffs testified at this hearing against the H–GAC's continued designation and submitted their proposal for a not-for-profit corporation. Following this hearing, in a letter from Mr. Nick Tramonte to Judge Deison rejecting H–GAC's proposed solution, Mr. Tramonte states: "[The] H–GAC and the HSA have a long history of being unable to work together cooperatively. This was well established at the August 6 hearing in Dallas. I am of the opinion that it would be to every-one's advantage and to the public's benefit to resolve these problems permanently."

On August 31, 1981, Dr. Rorrie informed Judge Deison that the H–GAC's HSA status was being dropped from full to conditional. Dr. Rorrie gave the H–GAC six more months to resolve the outstanding issues. He set forth the following framework:

1. The liaison committee must be reactivated and within 30 days develop a proposal as to how the two groups will function. Any disagreement between the two groups should be discussed and negotiated by the liaison committee. H–GAC should submit to the Dallas Regional Office bi-monthly reports on the functioning of this committee.

2. The governing body (the Area Health Commission) must function in accordance with the requirements of the Public Health Service Act and the regulations implementing this program.

3. In view of previous staff turnover and the potential for any future turnover to adversely affect the capacity of the agency to carry out its functions, all efforts must be made to retain existing staff. Any unusual amount of staff turnover will be considered a reflection of the agency's capacity to manage and perform its functions.

4. H–GAC will insure that services will be provided to the Area Health Commission in a timely manner and will appropriate funds so that the Commission can pay its accounts and meet its financial obligations.

5. H–GAC will fully cooperate with the Department of Labor and the Department of Health and Human Services in negotiating an indirect cost rate not to exceed the 23.5 percent rate. (This rate was guaranteed by you in your letter to me of August 11.)

On September 1, 1981, following a Special Meeting of the H–GAC Board of Directors, the H–GAC announced that the Commission was being dissolved and that a new twenty-four person Commission was being established. During the course of the Sep-

tember 1 meeting, Judge Deison revealed that the H–GAC created the new Commission in order to eliminate "entrenched power" on the original Commission. Several of the Commissioners who had served on the previous board were reappointed. However, none of the Commissioners who supported the dedesignation of the H–GAC and the designation of the not-for-profit corporation were reappointed. The H–GAC informed those Commissioners who had been discharged that the new Area Health Commission was formed "because of the need to move forward immediately with our health planning work in an environment of compatability between the Area Health Commission and the Board."

The plaintiffs brought this action against the H–GAC and the Department of Health and Human Services under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343, alleging that defendants violated their constitutional rights by failing to accord them procedural due process in their dismissal as required by the Due Process Clause of the fourteenth amendment and by dismissing them because they criticized the operations of the H–GAC, which speech is protected by the first amendment.

### CONCLUSIONS OF LAW

The H–GAC is a political subdivision of the state of Texas, Tex.Rev.Civ.Stat.Ann. art. 1011m § 4 (Vernon's Supp.1963–1982). As such, it is bound by the fourteenth amendment, which commands that a state shall not deprive any person of life, liberty, or property, without due process of law.... U.S. Const. amend. XIV. The Due Process Clause thus requires that, where the government takes action that impairs one's life, liberty or property, the government must provide some type of fair procedure for the consideration of the interest impaired.

■ The Supreme Court has long held that a benefit, such as public employment, is a property interest if there is a "legitimate claim of entitlement" to the position.

*Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 561 (1972); *Perry v. Sinderman,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570, 580 (1972). A property interest in public employment arises when the interest is created by a law, rule, or understanding that secures the benefit and supports the claim of entitlement. *Id.* Thus, the Supreme Court has held that where the applicable law provides that a public employee will be discharged for "good cause only", the employee has a legitimate claim of entitlement to the position, which is a property interest protected by the Due Process Clause, but where there is no such provision for discharge the employee has no such entitlement. *See Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (no entitlement where state employee, as a matter of state law, holds position "at the will and pleasure of the city"); *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (federal employee has property interest in employment where federal regulations provide that employee could only be discharged for cause); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (state employee has no property interest in employment where contract did not provide for renewal absent "sufficient cause"); *Perry v. Sinderman,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (state employee has property interest where de facto tenure system exists, grounded in rules and understandings).

■ In the present case, pursuant to the National Health Planning and Development Act, 42 U.S.C. § 300*l*–1(a), the Secretary of Health, Education, and Welfare (presently the Secretary of Health and Human Services) promulgated regulations governing applications for designation as an HSA. These regulations require that an applicant for full designation submit a copy of the by-laws governing its operation that provides for removal of the governing body members of the HSA "for good cause only". 42 C.F.R. 122.104(b)(1)(iii)(A).[2] As required

---

**2.** The regulations provide that an application

for full designation contain:

by these regulations, the by-laws of the Area Health Commission of the H–GAC provide for removal of the Commissioners for good cause.[3] The by-laws of the Commission were incorporated into the H–GAC's application for full designation, which was granted in 1979. On September 1, 1981, when the H–GAC acting in its HSA capacity dissolved the Commission by removing plaintiffs, it was bound by the "for good cause only" obligation of the federal regulations.[4] This clause creates a legitimate claim of entitlement, which constitutes property under the Due Process Clause.

This finding of a property interest is not affected by the fact that plaintiffs received no monetary compensation for their work. It is clear from *Roth* and its progeny that the determination of an interest as a "property" interest turns upon the finding of a claim of statutory entitlement to a benefit, rather than on the economic value of the benefit itself: "To have a property interest in a benefit, a person ... must have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined." *Board of Regents v. Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. As emphasized recently by the Supreme Court: "The hallmark of property ... is an individual entitlement grounded in state law which cannot be re-moved except 'for cause' .... Once that characteristic is found, the types of interests protected as property are varied and, as often as not, intangible relating 'to the whole domain of social and economic fact.'" *Logan v. Zimmerman Brush Company,* 455 U.S. 422, 430, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265, 274 (1982) (citations omitted).

■ As the court made clear in *Logan,* in our modern society, property takes many forms "relating 'to the whole domain of social and economic fact.'" *Id.* The broad range of property interests needing constitutional protection are not limited to tangible items traditionally referred to as property, such as real estate, chattels, or money, but rather extend to intangible economic as well as social interests. *See also Goldberg v. Kelly,* 397 U.S. 254, 262 n. 8, 90 S.Ct. 1011, 1017 n. 8, 25 L.Ed.2d 287, 295 n. 8 (1970). As aptly stated by one commentator:

Wealth or value is created by culture and by society; it is culture that makes a diamond valuable and a pebble worthless. A man who has property has certain legal rights with respect to an item of wealth; property represents a relationship between wealth and its "owner."

\* \* \* \* \* \*

[T]he forms [of wealth or value] are constantly changing and differ in every culture. But today more and more of our

---

(1) A copy of the Articles of Incorporation and By-laws (or, in the case of a public regional planning body or single unit of general local government, its charter, authorizing statute, ordinance, or executive order, and any internal rules or regulations which govern its operations) of the applicant, which must provide:

\* \* \* \* \* \*

(iii) The manner in which governing body members will be selected and replaced, including provisions for:

(A) Removal of governing body members for good cause only:

42 C.F.R. 122.104(b)(1)(iii)(A).

3. Article 4 of the Commission's by-laws governs the members of the Commission. It provides, in part:

4.3.... Members shall be removed if they remove their place of residence from the health service area. Members may be removed for good cause or if they are recorded absent at three consecutive regular meetings of the Area Health Commission. The removal will occur upon the recommendation at the Membership Advisory Committee and a two thirds vote of the members of the Area Health Commission present at a regular scheduled meeting, a quorum being present.

4. Although H–GAC's designation was dropped from full to conditional status on August 31, 1981, this does not obviate the requirement that the Commissioners be removed "for good cause only," as they continued to operate under the 1979 application and regulations, except to the extent that they were required to follow the framework outlined by Dr. Rorrie in his August 31, 1981 letter to Judge Deison.

wealth takes the form of rights or status rather than of tangible goods.

C. Reich, The New Property, 73 Yale L.J. 733, 738–39 (1964).

While some benefits found by the Supreme Court to be property are of direct economic value, see, e.g., Barry v. Barchi, 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979) (occupational license); Perry v. Sinderman, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed. 570 (1972) (salaried government employment); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (welfare benefits), other benefits held to be property interests are of indirect economic value or are of value only to the holder, see, e.g., Logan v. Zimmerman Brush Co., 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) (litigants right to have a cause of action heard by a state's Fair Employment Practice Commission); Memphis Light, Gas and Water Div. v. Craft, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978) (utility service); Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (public education); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (driver's license). These latter property interests are not necessarily capable of economic or monetary valuation and it is clear that these benefits need not be of value in an economic sense in order to qualify as property interests.[5]

Because plaintiffs have a property interest in their positions within the meaning of the Due Process Clause, it is necessary to determine what process is due. Morrissey v. Brewer, 408 U.S. 471, 481–82, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). The type of process due varies depending upon the facts of a case, since different situations requiring procedural safeguards do not necessarily call for the same type of procedure. Id. At the minimum, however, the government must "afford notice and the opportunity for a hearing appropriate to the nature of the case." Bell v. Burson, 402 U.S. 535, 542, 91 S.Ct. 1586, 1591, 29 L.Ed.2d 90, 96 (1971), citing Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865, 872 (1950). To determine the timing and formality of the procedural protections, the Supreme Court weighs the personal interest infringed with the government interest:

> [I]dentification of the specific dictates of due process generally requires consideration of three factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

In the area of government benefits, this balancing process has resulted in varying

---

**5.** To the extent that the Supreme Court has addressed the economic value of the benefits created by law, it has been limited to dicta. In Logan v. Zimmerman Brush Company, 455 U.S. 422, 102 S.Ct. 1148; 71 L.Ed.2d 265 (1982), for example, the court after finding the FEPA claim a property interest, stated: "And an fair employment practices claim, which presumably can be surrendered for value, is at least as substantial as the right to an education labeled property in Goss v. Lopez." And, in Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), the Court noted that "once licenses are issued . . ., their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees." In Memphis Light, Gas and Water Div. v. Craft, 436 U.S. 1, 98 S.Ct.

1554, 56 L.Ed.2d 30 (1978) and Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), however, once the Supreme Court found a legitimate claim of entitlement to the benefit, it did not discuss the economic value of the benefit or weigh the substantiality of the interest.

This court also declines to follow dicta in cases decided in other circuits to the effect that the finding of a property interest in employment or appointment to a position turns not only on whether one has statutory entitlement to the position, but also, on whether the position is economically beneficial. See, e.g., Rodriguez de Quinonz v. Perez, 596 F.2d 486 (1st Cir.1979); Mitchell v. King, 537 F.2d 385 (10th Cir.1976); Janusaitus v. Middleburg Volunteer Fire Dept., 464 F.Supp. 288 (D.C.Conn.1979).

rules. Some deprivations of government benefits can only be accomplished with notice and a detailed administrative hearing before termination of the benefits, *see, e.g., Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (welfare benefits), or notice and an informal predeprivation hearing, *see, e.g., Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (education); *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (driver's license). For other interests, however, due process is satisfied by post-deprivation hearings, *see, e.g., Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (social security disability benefits).

The Fifth Circuit has applied this balancing test in cases involving public employment to define the scope of due process procedures necessary to protect against the wrongful taking of the employee's property interest in employment. The court delineated the following test:

> Where a governmental employer chooses to postpone the opportunity of a nonprobationary employee to secure a full-evidentiary hearing until after dismissal, risk reducing procedures must be accorded. These must include, prior to termination, written notice of the reasons for termination and an effective opportunity to rebut those reasons. Effective rebuttal must give the employee the right to respond in writing to the charges made and to respond orally before the official charged with the responsibility of making the termination decision.

*Thurston v. Dekle,* 531 F.2d 1264, 1273 (5th Cir.1976), *vacated on other grounds,* 438 U.S. 901, 98 S.Ct. 3118, 57 L.Ed.2d 1144. *See also Stenseth v. Greater Ft. Worth and Tarrant County Community Action Agency,* 673 F.2d 842, 846 (5th Cir.1982); *Downing v. Williams,* 624 F.2d 612, 618 (5th Cir.1980). In formulating this test the court balanced the government's interest in efficient operation with immediate termination of the employee. The court noted that requiring elaborate pretermination procedures and paying wages to unproductive employees militates against efficient city operation. On the other hand, the court considered the interest of the employee against immediate termination of the employee's wages and benefits.

Because the Commissioners in this case did not receive compensation, the interests to be balanced are quite different than those before the court in *Thurston v. Dekle,* 531 F.2d 1264 (5th Cir.1976), *vacated on other grounds,* 438 U.S. 901, 98 S.Ct. 3118, 57 L.Ed.2d 1144. If plaintiffs had been salaried employees, this would have been, on one hand, an additional reason for H–GAC to promptly terminate the plaintiffs, and on the other hand, a reason for plaintiffs to want a full pretermination hearing, rather than immediate dismissal and suspension of wages followed by post-deprivation hearing.

■ In balancing the H–GAC's interest in effective operation of the HSA with the plaintiff's interest in serving on the Commission, this court is of the opinion that plaintiffs should have been provided, before termination, with notice of the reasons for their termination and an opportunity to respond in writing and orally before the appropriate H–GAC officials and, following termination, with a full hearing.

The plaintiffs were not afforded the proper procedures. On August 31, 1981, the H–GAC was apprised by the Director of the Bureau of Health Planning that the H–GAC and the Commission had six months to resolve their disputes. On September 1, 1981, the H–GAC announced that it was dissolving the Commission, and on September 3, 1981, plaintiffs were notified of this decision by a letter in which plaintiffs were conveyed H–GAC's appreciation of their time and effort on behalf of the health care programs in this area. Plaintiffs were not afforded notice, the opportunity to rebut the charges, or the opportunity for a hearing.

Plaintiffs also contend that their first amendment right of free speech was violated by defendants removing plaintiffs from the Commission in order to silence plaintiffs' criticism.

In establishing a violation of their right to free speech, plaintiffs must prove that their speech was constitutionally protected and that it was a substantial or motivating factor in the H–GAC's decision not to dissolve the AHC. If plaintiffs successfully carry this burden, the burden falls on the defendants to prove, by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct. *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471, 484 (1977). Specifically, plaintiffs contend that representatives of the Commission spoke at the August 6, 1981 dedesignation meeting and, in testifying against the H–GAC, criticized the H–GAC and its performance and thereby angered members of the H–GAC. They further contend that the H–GAC was dropped from full to conditional status on August 31, which was directly as a result of plaintiffs testimony at the August 6 meeting. Finally, plaintiffs contend that the Commission was dissolved in retaliation to plaintiffs' criticism, which is evidenced by Judge Deison's comment that the Commission was dissolved in order to eliminate "entrenched power" and by the fact that those Commissioners who testified *on behalf* of the H–GAC at the August hearing were reappointed to the newly formed Commission.

Although the comments made by the plaintiffs at the August 6 meeting are not before the court, if it is assumed that such comments were critical of the H–GAC, as was other correspondence between the Commission to the national and regional office of the Department, this criticism would likely be protected by the first amendment. As the Supreme Court has stated, "statements by public officials on matters of public concern must be accorded First Amendment protection despite the fact that the statements are directed at their nominal superiors." *Pickering v. Board of Education,* 391 U.S. 563, 574, 88 S.Ct. 1731, 1737, 20 L.Ed.2d 811, 820 (1968), *citing Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); *Wood v.*

*Georgia,* 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962).

This court is of the opinion that even if the plaintiff's criticism is protected conduct, and even if it were a motivating factor in the H–GAC's decision to dissolve the Commission, the H–GAC would have dissolved the Commission in the absence of the protected conduct. It was clear to both groups that they could not work effectively together. This is evidenced throughout the statement of facts. The Commission itself recognized this inability to function together, and filed a competing application for designation as this area's HSA. The Commission did not prepare or file an application on behalf of the H–GAC, but instead sought support for the non-profit corporation's application and sought support for the dedesignation of the H–GAC. The H–GAC was threatened with dedesignation if it couldn't resolve the differences with the Commission, and the Commission thus had reason not to resolve their differences. While the Commissioners right to speak out against the H–GAC is a right protected by the first amendment, their protected speech was not the reason that the H–GAC dissolved the Commission.

Plaintiff's request that this court grant plaintiffs reinstatement and award plaintiffs nominal damages. Having found plaintiff's first amendment claim to be without merit, this court is of the opinion that reinstatement which is a "necessary element of an appropriate remedy in wrongful employee discharge cases," *Abbott v. Thetford,* 529 F.2d 695 (5th Cir. 1976), is not appropriate in this case. Rather, due to the finding of this court that plaintiffs had a property interest, the H–GAC is obligated to grant a hearing at their request where they can "be informed of the grounds for [their] nonretention and challenge their sufficiency." *Perry v. Sinderman,* 408 U.S. 593, 603, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570, 580–81 (1972).

Plaintiffs may recover nominal damages in the amount of one dollar for the denial of their right to procedural due process under

*Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252, 266–67 (1978).